

Entered on Docket
August 15, 2006

_____
**Hon. Bruce A. Markell
United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:

TRANS MAX TECHNOLOGIES, INC.,

    Debtor.

Case No.: BK-S-05-19263-BAM
Chapter 11

Date:  N/A
Time:  N/A

**OPINION ON CONFIRMATION**

On September 8, 2005, Trans Max Technologies, Inc. ("Trans Max") filed a voluntary petition for chapter 11 bankruptcy, and thereafter has served as debtor in possession. The court held hearings on confirmation of debtor's plan on April 26–27, 2006. At these hearings, Samuel Higgins ("Higgins"), Trans Max's president, testified as to all confirmation issues. The Office of the United States Trustee ("UST") appeared and objected; several creditors filed written objections but did not appear.

At the conclusion of the hearing, the court took the matter under submission after requesting post-hearing briefs from Trans Max and the UST. After reviewing the evidence and these briefs, the court denies confirmation.

**I.    Description of Trans Max and Its Proposed Plan**

Trans Max is not a typical debtor in possession. To understand the confirmation issues raised by its plan, some explanation of Trans Max's background is appropriate.

A.  *Trans Max*

For many years, Trans Max was known as Perma-Tune Electronics. It manufactured ignition systems for automobiles and boats. During this period, Perma-Tune registered its common stock with the Securities and Exchange Commission, and listed its stock for sale on the OTC Bulletin Board.[1] Sometime in 2004, Perma-Tune was acquired by a company in which Higgins had majority control, and Higgins then changed its name to Trans Max. After the acquisition, Higgins, who splits his time between Bakersfield, California, and Dubai, United Arab Emirates, controlled about 66% of Trans Max's common stock.[2] After reviewing Trans Max's activities, Higgins soon closed down its manufacturing operations.

Higgins had other plans for Trans Max. Initially, he caused Trans Max to invest in developing a technology radically different from that found in its ignition systems manufacturing. Between 2004 and 2005, Trans Max explored ways to produce water from air. Those investigations proved disappointing, and Trans Max abandoned that effort.

Higgins next directed Trans Max to investigate and invest in the technologies that are at issue in this confirmation. Higgins has previously paid $50,000 to acquire the rights to exploit the

---

[1] As explained on the OTC Bulletin Board website, listing on the OTC Bulletin Board signals that the company listed is current with all its securities filings, which is not the case if the stock is listed only in the "pink sheets." See http://www.otcbb.com/faqs/otcbb_faq.stm, item 4 ("An over-the-counter (OTC) security is generally considered to be any equity security that is not listed on NASDAQ, NYSE or AMEX. The OTCBB and the Pink Sheets are both quotation services for OTC securities. NASDAQ operates the OTCBB service and permits NASD members to quote any OTC security that is current in certain required regulatory filings . . . . The Pink Sheets is a privately owned company that permits NASD members to quote any OTC security and does not maintain regulatory filing requirements. An OTC security can be dually quoted on both the OTCBB and the Pink Sheets.")

[2] Higgins is an entrepreneur who does not have a scientific background. He is also the judgment debtor on an unsatisfied multi-million dollar judgment arising from a previous debt-for-equity exchange. His explanation for that liability is that he agreed to pay back a loan with stock of a company that had an oil concession in Paraguay, and that due to a change in governments in that country, he was unable to gain access to proof that would have exonerated him. Regardless, the judgment exists, and remains unsatisfied.

patented design of a Vertical Takeoff and Landing (VTOL) aircraft.[3] Higgins is also an officer and principal in a company called Axial Vector Engine Company, the proprietor of a new type of engine technology, called "axial vector technology." Higgins asserts that this technology can produce significant power despite its relatively small size and weight, making it ideal for flying cars. Based on this belief, Higgins decided that this engine technology could be married with the patent license he had acquired, and that Trans Max could be the entity that would make the idea, well, fly.

But Trans Max had a hangover of debts arising from its prior life, including some outstanding judgments and employee claims. To rid the new Trans Max of these legacy debts, Higgins caused Trans Max to file this chapter 11 case, and to file its plan of reorganization.

     B.    *Trans Max's Proposed Plan*

Trans Max's reorganization plan is simple. On the financial side, the plan cancels all outstanding debt and all outstanding equity securities. It then proposes to issue to creditors only, on a pro-rata basis, 1,000,000 shares of new Trans Max common stock. The plan also calls for Higgins to contribute $50,000 and his design rights to the VTOL aircraft to Trans Max. In return for these contributions of "new value," Higgins will receive 9,000,000 shares of newly-issued Trans Max common stock. Trans Max will keep its stock registration with the Securities and Exchange Commission, and its listing on the OTC Bulletin Board, so that the new common stock will be freely tradeable. *See* 11 U.S.C. § 1145.

On the operational side, Trans Max intends to press ahead with development of its flying car business plan. It plans to build prototype flying cars (to be tested in the United Arab Emirates), and if the prototypes prove successful, to manufacture and market these cars. It is critical to Trans Max's plan that the reorganized Trans Max will not incur any debt for these development activities. It

---

[3]Under the terms of the patent acquisition agreement, Higgins must cause Trans Max "to explore the feasibility of conducting research and development to produce a commercially practical VTOL Personal Aircraft. If Trans Max . . . does not decide to proceed with such research and development within a period of three (3) years. . . [Higgins] will reassign . . . the Patents to Seller."

3

is to function simply as a royalty licencing vehicle by licensing its design for flying cars incorporating the axial vector technology to joint ventures which will be funded 100% by unspecified outsiders. In Trans Max's view, this gives the current creditors no worse than they would get in liquidation – which Trans Max estimates to be zero – and some potential upside if the idea takes flight.

## II.     Legal Problems with Trans Max's Plan

Two creditor groups objected to Trans Max's plan, as did the UST. These are discussed in order.

### *A.     Creditors Holding Disallowed and Unfiled Claims*

A group of creditors made up of former employees filed the first objection. With respect to these creditors, however, their claims either had been successfully objected to and disallowed before confirmation, or they were not listed on Trans Max's schedules.[4]

As to those claims disallowed by prior court order, Section 1126(a) permits a creditor to vote only if the creditor is a "holder of a claim [that has been] allowed under Section 502 . . . ." Disallowed claims are not allowed claims, perforce, and thus their holders may not vote. *See* RICHARD F. BROUDE, REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE § 11.05[1] (2006).

As to the remaining claimants, they did not file proofs of claim and were not listed on Trans Max's schedules. That they had knowledge of Trans Max's bankruptcy is evident from the fact that they filed an objection to confirmation. They thus also had an obligation to file a proof of claim in order for their claims to be recognized. Under FED. R. BANKR. P. 3003(c)(2) "any creditor whose claim . . . is not scheduled . . . shall file a proof of claim . . . ; any creditor who fails to do so shall not

---

[4]Debtor's counsel provided a declaration with respect to the claims that had been objected to, and the court took judicial notice of its own docket with respect to the results of those objections. The court also took judicial notice of Trans Max's claims register with respect to the absence of proofs of claims filed by other claimants. Taking judicial notice in this context invokes both the court's power to independently introduce evidence under FED. R. EVID. 614, and FED. R. EVID. 201's authentication of such records. Wetherbee v. Willow Lane, Inc. (*In re* Bestway Prod., Inc.), 151 B.R. 530, 540 (Bankr. E.D. Cal.1993), *aff'd*, 165 B.R. 339 (B.A.P. 9th Cir. 1994) (table). *See also* O'Rourke v. Seaboard Surety Co. (*In re* E.R. Fegert, Inc.), 887 F.2d 955, 957, 958 (9th Cir. 1989); Welther v. Donell (*In re* Oakmore Ranch Mgmt.), 337 B.R. 222, 226 (B.A.P. 9th Cir. 2006).

4

be treated as a creditor with respect to such claim for the purposes of voting and distribution." Thus, these claimants may not vote, and they do not have standing to object to the plan. Kinney v. IRS (*In re* Kinney), 123 B.R. 889, 890-91 (Bankr. D. Nev. 1991). Their objections are thus overruled.

  B.  *Improper Solicitation*

Another creditor, joined by the UST, alleges that Trans Max's counsel engaged in improper solicitation of votes. Based upon this allegation, the UST and the creditor asserted that confirmation must be denied because the plan proponent did not comply with the requirements of title 11 with respect to balloting. 11 U.S.C. § 1129(a)(2) (plan proponent must comply "with the applicable provisions of this title.").

The specific conduct at issue occurred when affirmative votes were not coming in as fast or as numerous as Trans Max wanted. On April 10 and 11, 2006, approximately one week before the ballot deadline, Trans Max's counsel sent an email to various holders of large claims.[5] Each email was essentially identical in all material details, and stated:

> By now, you should have received a ballot for the proposed chapter 11 plan
> and a booklet containing the plan, a disclosure statement, and other documents.
> You appear to have one of the largest claims in the case. It is therefore very
> important that you mark your ballot with a "yes" vote in favor of the plan and
> return the ballot to me so that it is received by April 19.
> As discussed in the disclosure statement, Trans Max has no cash with which to
> pay claims and no operating business. The plan calls for Sam Higgins to
> contribute new capital to the company, for the current stock in the company to

---

[5] There were other creditor contacts during this period, some made by email and others made by telephone. From debtor's counsel's declaration supplied after the hearing, these contacts consisted of inquiries initiated by creditors and related to ministerial requests, such as the replacement of a lost ballot form. Given the care with which counsel crafted the email discussed in the text, the court is willing to find that to the extent such conversations went beyond ministerial requests, debtor's counsel said nothing materially different from the text of the emails introduced into evidence.

5

be cancelled, and for creditors (like yourself) to be issued new, free-trading stock in the company. Please note that the alternative to the plan is a chapter 7 liquidation, a scenario that would provide nothing whatsoever for creditors.

The nub of the objection is that this message contains false and misleading statements,[6] and that it constitutes an improper directive as to how a particular creditor should vote.

It is of course beyond doubt that a plan may not be confirmed if the proponent solicits votes before approval and distribution of a disclosure statement.[7] That result flows from the text of Section 1125(b): "An acceptance or rejection of a plan may not be solicited after the commencement of the case . . . from a holder of a claim . . . unless, at the time of or before such solicitation, there is transmitted to such holder the plan . . . , and a written disclosure statement approved . . . by the court as containing adequate information." Section 1129(a)(2) then elevates Section 1125(b)'s prohibition into a confirmation requirement.

But the solicitation here – and it was a solicitation because it directly requested that creditors exercise their vote on a specific plan in a particular way – occurred *after* the court had approved debtor's disclosure statement. Under such circumstances, the need addressed by Section 1125(b) has been met. Creditors possess a disclosure statement that the court has vetted, usually with assistance of interested party objections. Although not many courts have addressed this issue, those that have addressed it have recognized that not all post-approval solicitation must be court-approved. Century Glove, Inc. v. First Am. Bank, 860 F.2d 94, 100-01 (3d Cir. 1988) ("Thus, we find that § 1125 does not on its face empower the bankruptcy court to require that all communications between creditors be approved by the court. . . . A creditor may receive information from sources other than

---

[6] The UST also states that some courts have prohibited any solicitation of votes, regardless of whether the solicitation occurred after approval and dissemination of a disclosure statement, yet it cites no cases for that proposition.

[7] The obvious exception to this statement is the Bankruptcy Code provisions that authorize prepackaged bankruptcy plans. *See, e.g.,* 11 U.S.C. § 1125(g).

6

1  the disclosure statement."); Official Comm. of Equity Sec. Holders v. Wilson Law Firm, P.C. (*In re*
2  Mirant Corp.*), 334 B.R. 787, 792 (Bankr. N.D. Tex. 2005); *In re* Apex Oil Co., 111 B.R. 245 (Bankr.
3  E.D. Mo. 1990); *In re* Gulph Woods, 83 B.R. 339 (Bankr. E.D. Pa. 1988).  *See also* Duff v. United
4  States Trustee (*In re* California Fid., Inc.), 198 B.R. 567, 572 n.7 (B.A.P. 9th Cir. 1996) (dicta).

The best analysis of when such non-approved solicitation does not affect confirmation or the votes solicited is *Apex Oil*.  There, the debtor had moved to enjoin a creditor from soliciting negative votes on its plan.  111 B.R. at 246.  The court had previously approved a disclosure statement, and the plan had been sent to creditors for their votes.  *Id.* at 245.  The court reviewed the authorities regarding post-disclosure statement solicitation, particularly *Century Glove*, and came to the conclusion that:

> assuming that the debtor's exclusivity period has expired, soliciting parties need not obtain prior court approval of solicited materials *only if*:
> 
> 1) the information provided is truthful and absent of any false or misleading statements or legal or factual mischaracterizations;
> 2) the information is presented in good faith;
> 3) the soliciting party does not propose or suggest an alternative plan which has yet to gain court approval or otherwise failed to travel through the appropriate legal channels, as dictated by the Bankruptcy Code.

*Id.* at 249 (emphasis in original).

This court adopts this standard.  It accommodates the need for adequate information (supplied by the court-approved disclosure statement), while allowing creditors and the debtor to engage in discussions and negotiations over the plan's fate.  As stated in *Apex Oil*, echoing *Century Glove*:

> Congress was concerned not that creditors' votes were based on misinformation, but that they were based on no information at all. *See* H.R.

7

95-595, at pp. 225-25 [*sic*], 95th Cong. 2d Sess., 124 Cong. Rec. \_\_\_\_, reprinted in, 1978 U.S.C.C.A.A.N. 5963, 6185 (House Report). Rather than limiting the information available to a creditor, § 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote. *See* S.R. 95-989, at pp. 121, 95th Cong., 2d Sess., 124 Cong.Rec. _____, reprinted in, 1978 U.S.C.C.A.A.N. 5787, 5907 ("A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business….") (Senate Report). The provision sets a floor, not a ceiling.

*Apex Oil*, 111 B.R. at 247, *quoting Century Glove*, 860 F.2d at 100.

In this case, counsel's email and discussions do not violate these precepts. The evidence shows that counsel was in good faith seeking to obtain votes of all creditors. The email did not propose or refer to any alternate plan; it only referred to the consequences of conversion to a liquidating case under chapter 7.

Both the UST and the creditor complain, however, that the solicitation was misleading and coercive. The UST contends that the statements regarding the consequences of conversion to chapter 7 were misleading in that they require an unwarranted assumption that the chapter 7 trustee would not find or pursue lawsuits against Trans Max's former management. While it is undeniably true that anyone who solicits votes after a disclosure statement has been distributed takes the risk that statements made during the solicitation are untrue, counsel's statements regarding the effect of a conversion to chapter 7 were no different in substance than what had already been approved in the disclosure statement. While at this stage these statements have not been proved through the adversary process, counsel convincingly testified that he believed them true when made. Given that the circumstances under which they were, counsel's belief was certainly reasonable and justifiable, especially given the court's approval of the disclosure statement. Finding that counsel held a reasonable and justifiable belief in the truth of the statements he made is a sufficient basis for finding

8

that the statements could be taken as not misleading or untrue for purposes of *Apex Oil*, and the court so finds.

The UST and the creditor also contend that the email was coercive, essentially amounting to a an order to vote for the plan. That argument is weak. These facts are a far cry from cases in which counsel has been held to act coercively by, for example, sending a pre-marked ballot with a postage-paid return envelope. *See, e.g., In re* Petroleum Prods., Inc., 99 B.R. 451, 452-53 (Bankr. D. Kan. 1989); *Gulph Woods*, 83 B.R. at 343. Here, in fact, one of the creditors solicited actually voted against the plan, demonstrating that creditors are not milquetoasts who crumple and comply with anything they are told. Moreover, the emails did not even direct a particular action; they simply underscored the importance of voting and of the individual creditor's vote. They did not employ any improper force or suggestion. When combined with the fact that they were not followed in at least one case, any charge of improper coercion is effectively refuted. There was no improper solicitation.

   C.  *Lack of Good Faith*

The UST and one creditor raised objections to the plan based upon a lack of good faith. Section 1129(a)(3) requires for confirmation that "[t]he plan has been proposed in good faith and not by any means forbidden by law." In this circuit, this requirement has been held to mean that "[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. . . . The requisite good faith determination is based on the totality of the circumstances." Platinum Capital v. Sylmar Plaza L.P. (*In re* Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002), *cert. denied*, 538 U.S. 1035 (2003).

This is not a case filed to avoid the consequences of state court litigation. *See, e.g.*, Computer Task Group, Inc. v Brotby (*In re* Brotby), 303 B.R. 177, 197-98 (B.A.P. 9th Cir. 2003). It is not a case in which a solvent debtor filed to take advantage of Bankruptcy Code provisions that provide for something expressly prohibited under nonbankruptcy law. *See, e.g.*, NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (*In re* Integrated Telecom Express, Inc.), 384 F.3d 108, 116 (3d Cir. 2004), *cert. denied*, 125 S. Ct. 2542 (2005). It is also not a plan proposed by a creditor to take

9

advantage of a rival's weakness, *e.g., In re* Unichem Corp., 72 B.R. 95 (Bankr. N.D. Ill.), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987), or an effort by a solvent company to circumvent normal litigation among its shareholders, *e.g.*, Connell v. Coastal Cable T.V., Inc. (*In re* Coastal Cable T.V., Inc.), 709 F.2d 762 (1st Cir. 1983). Rather, it is a case in which the plan constitutes an effort to make something out of a mess of stale debts and failed operations. That goal is certainly "consistent with the objectives and purposes of the Code," especially when an insolvent debtor proposes to cancel all debts and equity interests, and then distribute the equity interests in the reorganized debtor pro rata to prepetition creditors. The objection is thus overruled.[8]

        D.        *Compliance with "Fair and Equitable" Requirements*

Trans Max's plan seeks to eliminate all outstanding equity securities, including those held by Higgins. As all current equity security holders are being eliminated, the class is deemed to have rejected the plan, 11 U.S.C. § 1126(g), and thus the only method of confirmation is nonconsensual cramdown under 11 U.S.C. § 1129(b).

Under the general standard of Section 1129(b)(1), a plan must be "fair and equitable" in order to be confirmed over the objections of a dissenting class. One component of fair and equitable treatment is that a plan may not pay a premium to a senior class. New England Coal & Coke Co. v. Rutland R. Co., 143 F.2d 179, 186 (2d Cir. 1944); *In re* Evans Prods. Co., 65 B.R. 870, 873 (S.D. Fla. 1986); *In re* Exide Techs., 303 B.R. 48, 61 (Bankr. D. Del. 2003); *In re* Victory Constr. Co., 42 B.R. 145,

---

[8]This is especially the case when, all other things being equal, the debtor is, and is anticipated to be, a reporting company under the federal securities law, and is current on its reporting obligations. *See* note 1, *supra*.

To the extent that the good faith objection is based upon a perceived misuse of Trans Max's status as a reporting company under federal securities laws, the court treats that objection as being made Section 1129(d) rather than Section 1120(a)(3). One reason for looking to Section 1129(d) instead of 1129(a)(3) is that Congress restricted standing under Section 1129(d) to governmental units only. To allow an objection against the use of the securities laws as a good faith objection under Section 1129(a)(3) would thus bypass the standing requirements built into Section 1129(d). *Contra: In re* Maxim Indust., Inc., 22 B.R. 611 (Bankr. D. Mass. 1982) (plan proposed in which solvent company would acquire insolvent debtor solely to take advantage of tax attributes of debtor was not in good faith; no mention of Section 1129(d)).

10

155 (Bankr. C.D. Cal. 1984). As stated in COLLIER, "[t]his component of the fair and equitable rule will require valuation of the debtor in every case in which the plan proposes to eliminate equity or any junior class of creditors." 7 COLLIER, *supra*, at ¶ 1129.04[4][a][ii]; *see also* H.R. REP. 595, 95TH CONG., 1ST SESS. 414 (1977) ("[A] valuation of the debtor's business . . . will almost always be required under Section 1129(b) in order to determine the consideration to be distributed under the plan."). This valuation ensures that no class surviving confirmation will be paid more than in full through the capture of value that rightly belongs to the eliminated class.[9]

Put in concrete terms relevant here, to confirm its plan under Section 1129(b)(1), Trans Max must introduce evidence of Trans Max's insolvency. While insolvency for some purposes is a simply toting up of the difference between an entity's assets and liabilities, *see* 11 U.S.C. § 101(31), entity valuation for cramdown purposes typically involves some form of a discounted cash flow analysis. 7 COLLIER, *supra*, at ¶ 1129.06[2]; *see also* Consolidated Rock Prods. Co. v. Du Bois, 312 U.S. 510, 526 (1941) ("[t]he criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable.").

Trans Max, however, did not offer such an analysis into evidence, nor did it even attempt

---

[9]The standard example of such an impermissible plan might be one such as Trans Max's, in which all debt and equity securities are eliminated, and stock is issued pro rata only to prepetition creditors. If the debtor under such a plan had an entity valuation of $101, and aggregate debts of $100, the plan would not be fair and equitable as to the eliminated class of equity securities. COLLIER lists another example:

> Assume that a reorganized debtor has a debt-free value of $100. Assume further that it has prepetition senior claims of $90, and prepetition junior claims of $60, and one class of equity interests. The senior debt class proposes a plan under which all claims and interests will be eliminated, and all equity interests in the reorganized debtor will be issued to holders of senior debt in exchange for their claims. [¶] The plan is fair and equitable as to the prepetition equity interests. Under no circumstances is there any value left to allocate to them after satisfaction of all debt. The plan is not, however, fair and equitable as to the junior class of debt.

7 COLLIER, *supra* at ¶ 1129.06[2].

11

to systematically assess Trans Max's overall value. Normally, this would result in a denial of confirmation for failure to establish that the eliminated class was "out of the money." But here, Trans Max coincidently adduced evidence that it owed obligations in the millions of dollars, and assets that probably do not aggregate $100. It has no actual or projected income, and cannot estimate any future income until it reaches agreement with unspecified joint venture partners. Under such circumstances, the court will infer insolvency and find that the plan is fair and equitable as to the eliminated equity security holders.[10]

---

[10] This case does not present issues regarding the so-called "new value" corollary to the absolute priority rule because all classes of creditors (as opposed to equity security holders) accepted the plan or were left unimpaired. The only impaired creditor class accepted the plan, with five of seven (71.42%) creditors, holding $846,464 (95.86%) of claims voting, accepting the plan. Without a dissenting class of creditors, there is no need to invoke new value principles. *See* Bank of America, NT & SA v. 203 North LaSalle Street P'ship, 526 U.S. 434 (1999); Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (*In re* Bonner Mall P'ship), 2 F.3d 899, 908 (9th Cir. 1993), *cert. granted*, 510 U.S. 1039, *vacatur denied and appeal dismissed as moot*, 513 U.S. 18 (1994); Computer Task Group, Inc. v. Brotby (*In re* Brotby), 303 B.R. 177, 195 (B.A.P. 9th Cir. 2003).

The favorable treatment Higgins is to receive under the plan is not analyzed under the fair and equitable standard, as that standard is concerned primarily with different treatment between classes of different nonbankruptcy priority. Here, by contrast, the difference in treatment is among members of a class, all of whom have the same nonbankruptcy priority against Trans Max. In such cases, courts have used the unfair discrimination test found in 11 U.S.C. § 1129(b)(1) to assess the propriety of such differences. 7 COLLIER ON BANKRUPTCY ¶ 1129.04[3][b][ix] (Henry Sommers & Alan Resnick, eds., 15th rev ed. 2006) ("Unfair discrimination works only among claimants of equal nonbankruptcy priority."). Given the denial of confirmation based on a lack of feasibility, the court does not reach the issue of whether there is a "new value" corollary to the unfair discrimination standard, or whether Higgins's proposed contributions satisfy any such test. *See, e.g.,* Mason v. Paradise Irrigation Dist., 326 U.S. 536 (1946) (under Chapter IX; permissible to afford Reconstruction Finance Corporation (RFC), which held 92% of the outstanding issue of bonds, better treatment than other bondholders of same issue given the RFC's contributions to plan. The difference was whether to receive approximately 52% of the claim in cash (as did the RFC) or in part cash and part new notes (as did the objector)). *Compare* In re HRC Joint Venture, 187 B.R. 202, 204, 212 (Bankr. S.D. Ohio 1995) (joint proponent of plan, the City of Cincinnati, received more favorable treatment on its deficiency claim than did senior lender; differences in contributions--the city had waived part of its claim--noted and used as a basis for sustaining discrimination), *with In re* Shadow Bay Apartments, Ltd., 157 B.R. 363, 366 (Bankr. S.D. Ohio 1993) (alleged waiver of administrative claim insufficient to justify retention of one general partner's interest, when another general partner was required to make a cash contribution in order to retain its interest).

12

E.  *The UST's Independent Objections*

The UST raised two objections not made by any creditor: that the plan's principal purpose was avoidance of federal securities laws in violation of 11 U.S.C. § 1129(d); and that even if it passed this test, Trans Max was "likely to be followed by the liquidation, or need for further financial reorganization," and thus did not meet 11 U.S.C. § 1129(a)(11).[11]

1.  *Avoidance of Federal Securities Laws – 11 U.S.C. § 1129(d)*

The UST's first objection was that Trans Max's plan violated Section 1129(d) in that "the principal purpose of the plan is the avoidance of . . . the application of section 5 of the Securities Act of 1933." Under Section 1129(d), however, only governmental units have standing to object on this ground. In this circuit, the UST is not a governmental unit within the meaning of 11 U.S.C. § 101(27). Balser v. Department of Justice, Office of the United States Trustee, 327 F.3d 903, 908 (9th Cir. 2003) (United States Trustee was expressly exempted from definition of "governmental unit," and thus was not affected by Section 106(a)'s waiver of sovereign immunity for governmental units), *cert. denied*, 541 U.S. 1041 (2004).[12] No other governmental unit, such as the Securities and Exchange Commission, joined in the UST's objection. As a result, as no party with standing to raise the issue is before the court, it may not hear the UST on that point, and thus the objection on that point is overruled.

2.  *Feasibility – 11 U.S.C. § 1129(a)(11)*

Under cramdown, the plan proponent must show compliance with all of the statutory requirements for consensual confirmation except for the voting requirement found in 11 U.S.C. §

---

[11] The UST also objected to plan provisions regarding the exculpation of Trans Max's insiders and professionals, but Trans Max amended its plan after the hearing in a manner that addressed the UST's concerns.

[12] *Balser* read the exclusionary parenthetical in Section 101(27) – "(but not a United States trustee while serving as a trustee in a case under this title)" – as applying to the United States trustee not when acting as a trustee in a case, but in its administrative capacity. Thus, the reason for the court's ruling seems suspect. *But cf.* 11 U.S.C. § 101(15) (defining "entity" as including "person, estate, trust, governmental unit, and United States trustee," thus raising the issue of why Congress thought to separate governmental unit and United States trustee in the definition if the Code treated them as separate entities to begin with).

13

1129(a)(8). One of these requirements is the so-called feasibility requirement of Section 1129(a)(11), and the UST has raised an objection based upon the lack of feasibility. Feasibility determinations require proof that confirmation is "not likely to be followed by the liquidation, or the need for further reorganization, of the debtor . . . , unless such liquidation or reorganization is proposed under the plan." 11 U.S.C. § 1129(a)(11). "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation,'" Pizza of Hawaii, Inc. v. Shakey's, Inc. (*In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1984), *quoting* 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11] at 1129-34 (15th ed. 1984).

In considering whether a particular plan is feasible, courts have considered the following factors:

(1) the adequacy of the debtor's capital structure;

(2) the earning power of its business;

(3) economic conditions;

(4) the ability of the debtor's management;

(5) the probability of the continuation of the same management; and

(6) any related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See In re* Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000), *quoting In re* Temple Zion, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991); 7 COLLIER ON BANKRUPTCY ¶ 1129.03[11] (Henry Sommers & Alan Resnick, eds., 15th rev. ed. 2006).

As with any other confirmation requirement, the plan proponent must demonstrate its satisfaction by a preponderance of the evidence. Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (*In re* Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1997). The inquiry is thus on whether Trans Max, as plan proponent, has sufficiently established its postconfirmation viability, and its ability to meet its future obligations. Particularly important in this regard is that the plan proponent

14

demonstrate that any necessary financing or funding has been obtained, or is likely to be obtained. Crestar Bank v. Walker (*In re* Walker), 165 B.R. 994, 1004-05 (E.D. Va. 1994); *In re* Made in Detroit, Inc. 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003); *In re* Hoffman, 52 B.R. 212, 215 (Bankr. D.N.D. 1985). With or without this financing, however, "'section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.'" S & P, Inc. v. Pfeifer, 189 B.R. 173, 187 (N.D. Ind. 1995), *quoting In re* SM 104 Ltd., 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993), *aff'd*, 78 F.3d 587 (7th Cir. 1996) (table).

In assessing the evidence adduced for the feasibility requirement, "[t]he Code does not require the debtor to prove that success is inevitable, . . . and a relatively low threshold of proof will satisfy § 1129(a)(11)." Computer Task Group, Inc. v Brotby (*In re* Brotby), 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003) (citations omitted). But the court must still have a reasonable and credible basis for making the findings necessary under Section 1129(a)(11). Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988). In short, "[t]he debtor must offer more than speculation about the source of funding for the plan." *In re* Walker, 165 B.R. at 1003; *In re* Made in Detroit, Inc., 299 B.R. at 176.

Feasibility is thus the last, best hope of those who wish to prevent reorganization from becoming a revolving door for frangible firms doomed to fail again and again. *See* Price v. Spokane Silver & Lead Co., 97 F.2d 237, 247 (8th Cir. 1938) ("it was not the intention of Congress in enacting Sec. 77B [one of the first reorganization statutes] to place crutches under corporate cripples, fit subjects for liquidation, and send them out into the business world to be a menace to all who might purchase their securities or deal with them on credit."). Too often, the feasibility determination can be compromised by an unhealthy alliance of professionals who want their fees, creditors who want to postpone reporting the inevitable, and debtors who just want another chance. *See* Lynn M. LoPucki & Joseph W. Doherty, *Why Are Delaware and New York Bankruptcy Reorganizations Failing?*, 55 VAND. L. REV. 1933, 1983-84 (2002); Harvey Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2011 (2002) ("The real problem lies not in the Delaware Bankruptcy Court, but in the conference rooms across the country where the debtors and creditors create and agree to

reorganization plans. In those conference rooms, a bankruptcy judge has no control or influence, and the parties themselves may bind each other to dubious reorganization plans."); Brian L. Betker, Stephen P. Ferris & Robert M. Lawless, *"Warm with Sunny Skies": Disclosure Statement Forecasts*, 73 AM. BANKR. L.J. 809, 835 (1999) (studying 69 public companies and finding that "[o]n average, the reorganized firm falls short of the ambitious income forecasts presented to the court"). *Cf.* Steven H. Case, *Some Confirmed Chapter 11 Cases Fail. So What?*, 47 B.C. L. REV. 59, 64 (2005) ("uncontested confirmation hearings . . . , in the author's opinion, present the highest danger of excessively optimistic forecasts that could look foolish in hindsight if the debtor files again.").

From all of this, it can be seen that there are two basic problems with Trans Max's plan. First, its evidence to establish feasibility is insufficient, based on the testimony of an entrepreneur who has no engineering degree or background. *See* note 2, *supra*. Second, Trans Max's general theory of feasibility seems to be that its debt-free business plan is per se feasible. Both of these are incorrect, as shown below.

a. *Feasibility Of Trans Max's Business Plan*

Trans Max claims in its briefs and through Higgins's testimony that its business plan is sound and demonstrates that there will be no need for further financial reorganization. To establish this point, Trans Max, through Higgins, provided evidence that it has had preliminary negotiations with an investor in Dubai to provide Trans Max with 100% of the capital necessary for post-confirmation operations. Trans Max, however, has not identified any specific investors in its plan, and has only provided their possible location. The attenuated nature of these discussions is underscored by Trans Max's own briefs:

> Mr. Higgins has not yet secured a joint venturer for Trans Max because the Plan has not been confirmed, but he has had preliminary negotiations with potential manufacturing joint venturers and believes that, after confirmation, the company will be able [to] reach an agreement with a joint venturer to produce the aircraft under license.

16

This level of commitment is unacceptable for feasibility determinations under Section 1129(a)(11). As stated above, "[t]he debtor must offer more than speculation about the source of funding for the plan." *In re* Walker, 165 B.R. at 1003, *quoting In re* Briscoe Enters., Ltd., 138 B.R. 795, 807 (N.D. Tex. 1992). Just because Trans Max "believes" that it can find a joint venturer, that does not necessarily mean that Trans Max will obtain new money on acceptable terms. The court cannot reasonably rely on Trans Max's mere belief of new money coming into its operations after plan confirmation on the basis of only having preliminary negotiations.

Additionally, if Trans Max has had only preliminary negotiations, then it is premature for Trans Max to assert that "binding contractual commitments are certain to occur." Trans Max has not offered any evidence to the court of any binding contractual commitments with investors to infuse new cash into Trans Max's business. Thus, it is difficult to believe that investors will come through if the plan is confirmed, especially when Trans Max pleads that it will "*seek* a joint venture partner who would be responsible for providing 100 percent of the capital necessary to take the product from the bench to prototype to commercialization." (emphasis supplied). Even though "success need not be guaranteed," Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988), the court needs to be assured that there is a reasonable likelihood that Trans Max can deliver what it proposes, which is to obtain 100% funding from joint venturers.

                b.   *Per Se Feasibility Based Upon Capital Structure of Reorganized Trans Max*

Trans Max also advances an argument that, because of central features of its business plan, it essentially has guaranteed satisfaction of the feasibility requirement. In particular, it asserts that it will not have any debt following confirmation. From this, it draws the conclusion that, without debt, it will never need future financial reorganization. As Trans Max argues in its brief, "[c]reditors will not look to a stream of future payments for satisfaction [of their debts], and consummation of the plan is not dependent on the debtor attaining any particular level of ongoing financial performance." Even if its theory regarding the link between its debt-free business plan and the future need for bankruptcy is

17

viable, Trans Max has not, however, offered any assurances that Trans Max will not incur future debt, nor has it provided any reason to believe that it will not incur such debt. It has not bound itself in the plan to not incur any debt, and it has not proposed any changes to its articles of incorporation or by-laws which would impose restrictions on its ability to file bankruptcy. *Cf. In re* Kingston Square Assocs., 214 B.R. 713 (Bankr. S.D.N.Y. 1997). It has thus not shown that it will be forever debt-free.[13]

But Trans Max's general theory is flawed. Even if it could effectively relinquish its ability ever to be in bankruptcy again – a dubious proposition, given creditors' ability to file involuntary proceedings in bankruptcy – it still could not meet the requirements of Section 1129(a)(11). Trans Max's argument rests on the notion that, however risky or speculative its business plan, its intention to enter into licenses of its property that do not require any financial commitment on its part means that its current creditors may postpone the legal conclusion that their debts are worthless, and receive in return the possibility, however ephemeral, of something in the future. Since no promises are made by reorganized Trans Max, it can break none. On this assertion it distinguishes existing precedent on feasibility, which is couched in terms of a reorganized debtor's ability to meet plan commitments. To rephrase again: because the reorganized Trans Max will have no commitments, it contends that it does not bear any burden of showing how likely it is to make money in the future.

Trans Max seriously misperceives the function of the feasibility requirement. As noted by reorganization scholar Richard Broude:

> [u]nder former Chapter XI, feasibility meant only that the debtor could perform as called for in the plan. If the Chapter XI plan called for only one payment of cash to creditors at the time of confirmation, the feasibility test was

---

[13] Furthermore, Trans Max contends that Higgins's $50,000 contribution would be enough to meet any future debt obligations incidental to its royalty-generating business. As the UST has pointed out, Trans Max did not prepare any pro forma financial statements or projections as to Trans Max's postconfirmation cash flows or expenses, and the fees for its professionals alone will consume most of the $50,000 confirmation. Thus, the court is left with Higgins's unsubstantiated belief that this infusion of money, when added to any money from a joint venturer, would be sufficient to meet Trans Max's future debt obligations. That is insufficient to support a feasibility finding.

satisfied if the debtor has the cash. The standard of Section 1129(a)(11) is much more rigorous and represents a shift from plan viability to debtor viability.

RICHARD F. BROUDE, REORGANIZATIONS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE § 12.14, at p. 12-33 (2006). The obligation to scrutinize reorganizing debtors and not to release them until they are shown to be a viable business is echoed in the Ninth Circuit's exhortation that a court should "prevent confirmation of visionary schemes . . . ." Pizza of Hawaii, Inc. v. Shakey's, Inc. (*In re* Pizza of Hawaii), 761 F.2d 1374, 1382 (9th Cir. 1984). *See also* Danny Thomas Prop. II Ltd. P'ship v. Beal Bank, S.S.B. (*In re* Danny Thomas Prop. II Ltd. P'ship), 241 F.3d 959, 963 (8th Cir. 2001) (recognizing "courts' duty under § 1129(a)(11) to protect creditors against 'visionary schemes'").

Any sane investor would have serious and legitimate questions regarding the viability of Trans Max's technology, and Trans Max's inability to provide sufficient answers to those questions reaffirms a lack of feasibility in this case. Trans Max's technology may be promising, but the idea of developing a flying car based on that technology in three years, *see* note 3 *supra*, could be considered somewhat implausible. Even more implausible is the notion that Trans Max could develop such a car without incurring a cent of debt.[14]

**III.    Conclusion**

For all of these reasons, and especially because Trans Max has not yet secured any joint venturer or investors as called for in its business plan, the Court denies Trans Max's request for confirmation. This opinion constitutes the court's findings of fact and conclusions of law under FED. R. BANKR. P. 7052. A separate order denying confirmation will be entered under FED. R. BANKR. P. 9021.

///

---

[14]Or, put in a more colloquial way, the court does not think that investors will respond here the way investors did when they saw Professor Brainard's flying car in the movie *Flubber*: "When they saw us flying, they couldn't wait to write the check." FLUBBER (Great Oaks Entertainment & Walt Disney Pictures 1997).

19

| | |
|---|---|
| 1 | Copies sent to: |
| 2 | BARRY H JENKINS barry.jenkins@usdoj.gov |
| 3 | JOHN J. LAXAGUE jlaxague@caneclark.com |
| 4 | SARAH D. MOYED moyeds@sec.gov |
| 5 | U.S. TRUSTEE - LV - 11 USTPRegion17.lv.ecf@usdoj.gov |

6  Richard Bartel
   P.O. Box 5, 179 Montauk Highway
7  Remsenburg, NY 11960

8  Trans Max Technologies, Inc.
   2300 West Sahara Avenue., Ste. 1000
9  c/o McDonald Carano
   Las Vegas, NV 89102

10

   Linda Decker
11 Lonnie Lenarduzzi
   3 Grace Court
12 Center Moriches, NY 11934

13
                                            # # #
14